IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HARDEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DANIEL B. HARDEN, APPELLANT.

Filed January 5, 2021.    No. A-20-130.

Appeal from the District Court for Adams County: TERRI S. HARDER, Judge. Affirmed.

Shon T. Lieske, Adams County Public Defender, and John Heieck for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Daniel B. Harden appeals from his conviction, pursuant to a jury verdict, and sentence for conspiracy to commit robbery. He argues that the jury instruction setting forth the elements of the offense should have included withdrawal as an affirmative defense and that the trial court at sentencing improperly considered information that was relevant only to charges on which he was acquitted. Based on the reasons that follow, we affirm.

BACKGROUND

On February 13, 2018, the State filed an information charging Harden with count I, first degree murder, a Class IA felony, and count II, use of a firearm to commit a felony, a Class IC felony. The information was later amended to include count III, conspiracy to commit robbery, a Class II felony. The charges arose from an incident in which Jose Hansen was shot and killed during a purported drug transaction in Hastings, Nebraska, on September 11, 2017.

- 1 -

A jury trial began in October 2019. The evidence showed that the events leading up to Hansen's death began on the evening of September 10, 2017. Harden was at a gathering at a house rented by Deante Mullen and Katherine Creigh, who were dating. Two other individuals were also there, Serenity Crossfield and Deonte Hayes, who were also dating. Harden had known Mullen and Creigh for several years. Harden and Mullen became better acquainted in the summer of 2016. Harden had never met Crossfield and Hayes before that night. Hayes was a childhood friend of Mullen's and had recently moved back to Hastings and reconnected with Mullen.

The gathering began around 11:15 p.m. The group was talking and listening to music and everyone, with possibly the exception of Crossfield, was smoking marijuana. Mullen, Harden, and Hayes were also using other drugs, including Xanax and cocaine, and were drinking alcohol. Mullen and Hayes started talking about past criminal experiences, which included Hayes' robbery of an elderly couple earlier that evening. In response to Hayes bragging about his robbery, Mullen retrieved a rifle, known as a "Draco" and showed it to Harden and Hayes.

Mullen testified that at some point Hayes stated that he needed money and Mullen suggested that he would help him get money and suggested that they "hit a lick," which means commit a robbery. Mullen was a drug dealer who sometimes robbed other dealers to obtain drugs. Mullen testified that Hayes agreed to commit a robbery, as did Harden, who stated he too needed money and was "down for a lick," meaning he was going to participate in the robbery. Mullen then used his cell phone to contact potential targets for the robbery, including Hansen. Mullen testified that there was no conversation about how the robbery was going to happen.

After several phone contacts, Mullen arranged to meet with Hansen, who was also a drug dealer, to trade cocaine for methamphetamine and $100. However, Mullen testified that the plan was to rob Hansen of the methamphetamine. Sometime thereafter, Hayes became ill and vomited. Hayes and Crossfield then went into the spare bedroom to sleep.

Before leaving to meet Hansen, Mullen tried to wake Hayes but was unsuccessful. Mullen testified that he then asked Harden if he still wanted to do the robbery, and Harden indicated that he did. Mullen grabbed the Draco and the keys to Creigh's vehicle and told Creigh he was leaving to "hit a lick."

Mullen testified that he got in the driver's seat of the vehicle and handed the Draco to Harden, who was sitting in the front passenger seat. Mullen then drove to the location where he had agreed to meet Hansen and called him. A few minutes later, around 2:25 a.m., Hansen approached the vehicle on foot and got in the back seat behind Mullen. Hansen handed a baggie of methamphetamine to Mullen. Mullen testified that as he inspected the methamphetamine, Harden pointed the Draco at Hansen and upon seeing the gun, Hansen said, "Oh, shit" and opened the door to get out and run. Harden fired the Draco at Hansen and Mullen heard Hansen scream. Mullen testified that he got out of the vehicle and looked around but did not see Hansen. He closed the rear passenger side door, got back in the vehicle, and asked Harden why he shot Hansen. Harden responded, "I don't know. I didn't mean to." Mullen testified that he grabbed the Draco from Harden and drove back to his house. Mullen testified that Harden looked shocked after the gun went off. He did not know if Harden came into Mullen's house when they got back after the shooting. Mullen stated that Creigh was in the bedroom sleeping and she woke up when she heard

him say, "I think he shot him." Hansen's body was found around 6:30 a.m. lying face down in an alley not far from where he had been shot.

Mullen acknowledged that he agreed to testify at trial pursuant to an agreement with the State. In exchange for his cooperation and testimony, he would plead to attempted robbery and being an accessory to a felony, rather than being charged with first degree murder.

Creigh testified that Hayes brought up the idea of robbing someone and then the conversation turned to finding someone to rob. She testified that she heard Harden say "he's down" and that he needed money. Creigh testified that Mullen was then on his phone trying to find someone to rob. He was also talking to Harden but Harden was not really participating in a conversation with Mullen.

Creigh testified that Mullen told her he was going to "hit a lick" and he and Harden left the house, taking the Draco with them. She did not actually see Harden get into the car with Mullen. When Mullen returned to the house he was shaking and had tears in his eyes and said, "He shot him. He shot him." Creigh testified that Harden then came into the house, changed into different clothes and left.

Creigh testified that she was charged with being an accessory to a felony, but had an agreement with the State that if she testified in this case, she would be charged with a misdemeanor offense. She also had a pending assault charge that the State was going to dismiss.

Hayes testified that he does not remember being at Mullen's house on the evening of September 10, 2017, because he was under the influence of drugs before going there. He testified that he did not need money during that time, but could have said he did. He also testified that despite not remembering being at Mullen's house, he and Mullen did not rob anyone that night.

Crossfield testified that on the evening of September 10, 2017, Mullen and Hayes talked about setting up a robbery. She testified she heard Harden talk about being involved in the robbery and that he was trying to think of individuals to rob. She testified that after Hayes got sick, they both went into the bedroom to sleep and Hayes was with her all night. Harden was still at the house when she went to bed.

Harden testified that in September 2017 he was using marijuana "all day, every day," as well as sometimes using cocaine, Xanax, and prescription opiates. Mullen was his main source for drugs. Harden admitted that on the evening of September 10 into the early morning hours of September 11, he had consumed cocaine, Xanax, marijuana, and alcohol. He testified that he was very high and believed that everyone else in the group was too.

Harden testified that after Mullen and Hayes were talking about their past criminal experiences and Mullen showed them the Draco, Mullen and Hayes were on their phones, but he did not know what they were doing. Harden did not have a phone. Harden testified that neither Mullen nor Hayes said to him, "let's do a lick" at any time during the gathering. Harden also denied ever saying "I'm down with it." He also testified that he never said that he needed money because he had recently received an $11,000 inheritance.

Harden testified that Hayes eventually became so high that he threw up. Hayes then went to sleep in the spare bedroom with Crossfield. Creigh also went to bed after Hayes got sick. Harden testified that at that point he decided to leave Mullen's house and walked home to his apartment. He denied staying at Mullen's house and going with Mullen to rob Hansen. He further denied

shooting Hansen. Harden denied conspiring with anyone to rob Hansen, or robbing him or being present when he was robbed. He also testified that he never handled the Draco and had no role in shooting Hansen. He further testified that he did not hear anyone discuss committing a robbery during the gathering on September 11, 2017, and claimed that the other witnesses are lying.

Harden testified that when he got home after leaving Mullen's house, his roommate Errich Holston was home and very intoxicated. His friend, Laikyn Willison, was asleep on the couch and Holston's girlfriend was asleep in the bedroom. Holston came into Harden's bedroom to play video games and he noted the time on the PlayStation read 2:15 a.m. when he turned it on. Holston was making a lot of noise and as a result, a neighbor came to the door to complain about the noise. The neighbor confirmed that he went to Harden's apartment at 2 or 2:30 a.m. to complain about the noise.

Harden testified that another friend, Dustie Martin, showed up at Harden's apartment later and she and Harden smoked marijuana together. Harden testified that he logged into Facebook at 3:04 a.m. About 20 minutes later, Willison's phone rang and it was Mullen calling to talk to Harden. Harden talked to him and he wanted Harden to come over. Martin drove Harden over to Mullen's house and Mullen met him at the door. Harden testified that Mullen was distressed and told him he "caught a body," which means he killed someone, and mentioned it was Hansen. Harden also testified that Mullen subsequently said he "blasted someone," which he assumed meant he shot someone. Mullen would not explain to Harden what happened. After 30 minutes or so, Mullen drove Harden back home. On the ride back to Harden's apartment, Harden asked Mullen what happened and he said "dumb mother fucker tried to run."

The case was subsequently submitted to the jury, which returned a verdict of not guilty on count I, first degree murder, and on count II, use of a firearm to commit a felony, and a verdict of guilty on count III, conspiracy to commit robbery. The court accepted the jury's verdicts and entered judgment accordingly. It also ordered a presentence investigation (PSI). Following a sentencing hearing, the court sentenced Harden to 40 to 44 years' imprisonment.

## ASSIGNMENTS OF ERROR

Harden assigns (1) that his trial counsel was ineffective for failing to object to the jury instruction that set forth the elements of conspiracy to commit robbery because it failed to include withdrawal as an affirmative defense, (2) the trial court erred in failing to include withdrawal as an affirmative defense in the jury instructions, (3) the trial court erred in overruling his objection based on the 6th and 14th Amendments to the U.S. Constitution when the State asked the court to consider information during sentencing that was relevant only to the charges on which he had been acquitted, (4) the trial court erred in sentencing him as it took into consideration information that was relevant only to the charges on which he had been acquitted, and (5) the sentence imposed by the trial court was excessive.

## STANDARD OF REVIEW

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether

the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

When a party assigns as error the failure to give an unrequested jury instruction, an appellate court will review only for plain error. *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019). Plain error may be found on appeal when an error unasserted or uncomplained of at trial is plainly evident from the record, affects a litigant's substantial right, and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

*Ineffective Assistance of Counsel.*

Harden first assigns that his trial counsel was ineffective for failing to object to the instruction that set forth the elements for conspiracy to commit robbery because it did not include withdrawal as an affirmative defense.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). The two prongs of this test may be addressed in either order, and the entire ineffective assistance analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

Where, as here, appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review. *State v. Manjikian, supra.* An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.*

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.* An ineffective assistance of counsel claim will not be resolved on direct appeal if it requires an evidentiary hearing. *Id.*

In this case, the State submits that the record is sufficient to resolve Harden's claim of ineffective assistance of counsel and contends that Harden's claim is without merit. We agree.

Harden claims that his trial counsel should have objected to the jury instruction that set out the elements the State had to prove in order for the jury to find Harden guilty of conspiracy to commit robbery. The relevant part of the jury instruction at issue, jury instruction No. 3, stated as follows:

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict [Harden] of the crime of Criminal Conspiracy to Commit Robbery are:

1. That on or about September 11, 2017;

2. That [Harden] intended to promote or facilitate the commission of a robbery and;

3. That [Harden] agreed with at least one person to cause a robbery to be committed; and

4. That [Harden], or one of the co-conspirators, intentionally did any one of the following with the intent to further the criminal purpose of conspiracy:

a) Called and messaged various persons to set up a drug deal in order to commit a robbery of such persons during the commission of that drug deal; or

b) Left [a specified address in] Hastings, Nebraska and drove to a predetermined location in Hastings, Nebraska to meet Hansen in order to commit a robbery during the commission of a prearranged drug deal; or

c) Brought a firearm to the prearranged drug deal with Hansen in order to commit a robbery; and

5. That he did so in Adams County, Nebraska.

Harden's counsel did not object to the instruction nor did he request that the court instruct the jury regarding the defense of withdrawal.

Harden acknowledges that the instruction was in accordance with paragraphs (1) through (3) of NJI2d Crim. 3.4 Elements of Criminal Conspiracy. However, Harden argues that his counsel should have objected to the elements instruction because it should have also included paragraph (4) of NJI2d Crim. 3.4, which adds an additional element for the State to prove: "that the defendant did not withdraw from the conspiracy." Paragraph B of NJI2d Crim. 3.4 further states that "[a] member of a criminal conspiracy can withdraw from it only if (he, she) had a voluntary and complete change of mind and either gave timely warning to law enforcement authorities or otherwise made a reasonable effort to prevent the crime from occurring." The comments that follow NJI2d Crim. 3.4 state that

A defendant may withdraw from a conspiracy. Neb. Rev. Stat. § 28-202 (Reissue 1995). If a defendant claims that he did withdraw, and only if a defendant makes such a claim, then bracketed element (4) should be given together with bracketed paragraph B. Otherwise, the basic instruction normally ends with element (3).

Harden testified that on the night in question, after Hayes got sick and went to bed, he left Mullen's house and walked home. He denied staying at Mullen's house and going with Mullen to rob Hansen, as Mullen testified. Harden denied conspiring with anyone to rob Hansen, or robbing him or being present when he was robbed. He also testified that he never handled the Draco and had no role in shooting Hansen. He further testified that he did not hear anyone discuss committing a robbery on September 11, 2017, and stated that the other witnesses are lying.

Harden contends that assuming a conspiracy was formed, which he denies, there was evidence that he withdrew from the conspiracy based on his testimony that he left Mullen's house

- 6 -

and walked home. Harden argues that leaving Mullen's house before the robbery was committed constituted a "reasonable effort to present the crime from occurring" and the withdrawal language in NJI2d Crim. 3.4 should have been included in the jury instruction. Brief for appellant at 29-30.

NJI2d Crim. 3.4 is based on the statutory provisions that define criminal conspiracy and renunciation of criminal intent. Neb. Rev. Stat. § 28-202(1) (Reissue 2016) provides:

> A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:
>
> (a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and
>
> (b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

Neb. Rev. Stat. § 28-203 (Reissue 2016) provides for the renunciation of criminal intent as an affirmative defense:

> In a prosecution for criminal conspiracy, it shall be an affirmative defense that the defendant, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, gave timely warning to law enforcement authorities or otherwise made a reasonable effort to prevent the conduct or result which is the object of the conspiracy.

A conspiracy is ongoing until the central purposes of the conspiracy have either failed or been achieved. *State v. Honken*, 25 Neb. App. 352, 905 N.W.2d 689 (2017). Indeed, upon proof of participation in a conspiracy, a conspirator's continuing participation is presumed unless the conspirator demonstrates affirmative withdrawal from the conspiracy. *Id*. Such withdrawal must be effectuated by more than ceasing, however definitively, to participate in the conspiracy. *Id*. Rather, a coconspirator must make an affirmative action either by making a clean break to the authorities or by communicating abandonment in a manner calculated to reach coconspirators and must not resume participation in the conspiracy. *Id*.

In the present case, Harden may have ceased to participate in the conspiracy when he left Mullen's house and walked home. However, as set forth above, a defendant cannot withdraw from a conspiracy by merely ceasing to participate in the conspiracy. There was no evidence that he demonstrated an affirmative action to withdraw by notifying law enforcement or by communicating abandonment to his coconspirators. Accordingly, the evidence did not support including withdrawal as part of the jury instruction that set forth the elements of conspiracy to commit robbery. As such, Harden's trial counsel was not deficient in failing to object to the instruction as given or in failing to request the additional withdrawal language. We conclude the record is sufficient to resolve Harden's claim of ineffective assistance of counsel and Harden's claim fails.

*Plain Error by Trial Court.*

Harden next assigns that the trial court committed plain error by failing to include the withdrawal language in jury instruction No. 3. As previously noted, Harden did not object to the

instruction as given and did not request that the court include the withdrawal language. When a party assigns as error the failure to give an unrequested jury instruction, an appellate court will review only for plain error. *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019).

As previously discussed above, the only evidence that Harden withdrew from the conspiracy was his testimony that he left Mullen's residence and went home before the robbery occurred. Such evidence was not sufficient to warrant including the withdrawal language in the element instruction. Accordingly, the trial court did not commit plain error in regard to jury instruction No. 3.

*Sentencing.*

Harden next assigns that the trial court erred in overruling his objection during the sentencing hearing when the State asked the court to consider information that was relevant only to charges on which he had been acquitted. He claims that such information violated his rights to a trial by jury and due process of law, as well as his presumption of innocence guaranteed by the 6th and 14th Amendments to the U.S. Constitution.

During the sentencing hearing, the State argued, "The final thing that I will throw to this Court is actually directed to Mr. Harden and that I think probably summarizes this case and the damage that Mr. Harden's decisions caused, and that is to the family of . . . Hansen." Harden's trial counsel objected based on the 6th and 14th Amendments and argued:

> The offense of conviction in this case is conspiracy. And the argument that the counsel is making is that Daniel Harden caused some things. And there's no evidence of that at all. And I think it's improper argument, and I request the Court not take it into consideration in determining what the appropriate sentence here is in this case.

The trial court responded: "[t]he Court is well aware of what the conviction is for in this matter, but I'm going to allow the [S]tate to continue." The State continued as follows:

> This is -- the victim's mother, Wendy Hansen, submitted a letter. It's enclosed in the PSI, and counsel has had a chance to review it. She's asked me on her behalf, because she has the option of reading this letter in whole, but to read directly the last paragraph of her letter.
>
> And it says, "To Daniel Harden. I hope that you learn a healthier way to cope with life during your prison sentence. Your journey to a new beginning starts right where you are. Not guilty does not mean that you are innocent. Remember that. You'll have to live with your conscience for the rest of your life. I hope that you take the time to focus on what you would want your life to be like in the future because the end results of substance abuse are always the same, jails, institutions, and death. Your choices led to the death of [Hansen], and that is not something that will be easy to live with. Sincerely, Wendy Hansen."

Harden argues that the paragraph of the letter from the victim's mother was not relevant to the crime for which Harden was being sentenced. Due process requires that a sentencing judge consider only relevant information as the basis for a sentence. *State v. Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017). In a sentence hearing, a court, generally, has broad discretion

concerning the source of information and the type of information to be considered. *State v. Clear*, 236 Neb. 648, 463 N.W.2d 581 (1990). A sentencing judge may consider relevant information contained in a presentence report on the defendant to determine an appropriate sentence within the statutorily authorized penalty, punishment, or disposition applicable to the crime for which the defendant has been convicted. *Id.*

We conclude that the letter was relevant to the crime for which Harden was convicted. Although the paragraph of the letter read at the sentencing hearing implicated Harden in Hansen's death and Harden was not convicted on the murder charge, the conspiracy to commit robbery offense was part of the same factual situation that led to Hansen's death.

More importantly though, the entire letter written by Hansen's mother was contained in the PSI and therefore, already part of the record for the court to consider. Harden did not object to the letter being part of the PSI. At the sentencing hearing, Harden acknowledged that the court and the parties had reviewed the PSI before the hearing and were well aware of its contents. He further stated in his brief that the court and the parties knew about Hansen's mother's allegation that Harden had committed crimes for which he had been acquitted and for which he was not being sentenced because they had all read the PSI. Therefore, Harden was not prejudiced by the trial court allowing the State to read one paragraph of the letter at the sentencing hearing when the letter was already in the PSI. Harden's argument that the trial court erred in overruling his objection in regard to the letter fails.

Harden next assigns that the court erred in sentencing him because it took into consideration information that was relevant only to the charges on which he was acquitted, thereby violating his rights under the 6th and 14th Amendments. Harden first contends that the court based its sentence on the letter from Hansen's mother. Harden relies on a statement made by the court in pronouncing its sentence: "I would agree with [Harden's counsel] that this has been a difficult case, but also acknowledge the letters from . . . Hansen's mother and those that support [Harden] as well that are contained in the PSI." As we determined above, the letter was relevant to the charge on which Harden was convicted. Further, this statement by the court does not indicate it was basing Harden's sentencing solely or even primarily on the letter from Hansen's mother. Rather, it only acknowledged the letter from Hansen's mother as well as other letters that supported Harden contained in the PSI.

Harden also takes issue with another statement by the trial court which he claims shows that the court considered information relevant only to the charges on which he was acquitted. The court concluded the sentencing hearing by stating: "This sentence is largely for deterrence and the safety of this community. The message that streets of Hastings will not be surrendered to guns, drug deals, and robberies." Harden argues that the trial court's comment about not surrendering the streets to "guns, drug deals, and robberies" violated his presumption of innocence and his right to trial by jury.

Based on our review of the record, the court did not inappropriately consider information that was relevant only to the charges on which the jury acquitted Harden. The comments made by the court set forth above were only two comments made during the sentencing hearing. The court also discussed the role that substance abuse played in the matter, Harden's history of drug use, his

minimal criminal record before this case, that Harden was a bright individual, and the goals when sentencing an individual. Harden's second assignment of error in regard to sentencing fails.

Lastly, Harden assigns that the sentence imposed by the trial court was excessive. Harden was convicted of conspiracy to commit robbery, a Class II felony. Neb. Rev. Stat. §§ 28-202(4) and 28-324(2) (Reissue 2016). A Class II felony is punishable by a maximum sentence of 50 years' imprisonment and a minimum sentence of 1 year imprisonment. Neb. Rev. Stat. § 28-105 (Supp. 2019). The trial court sentenced Harden to 40 to 44 years' imprisonment, which is within the statutory limits.

The law governing review of criminal sentences is well settled. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.*

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

The record before us does not show an abuse of discretion by the trial court in sentencing Harden. The trial court reviewed the PSI and considered the appropriate sentencing factors. There is no indication that the trial court considered any inappropriate factors in determining the sentence to be imposed. Accordingly, we conclude that the trial court did not abuse its discretion and Harden's sentence is not excessive.

CONCLUSION

Based on the reasons set forth above, Harden's conviction and sentence for conspiracy to commit robbery is affirmed.

AFFIRMED.